UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        *Plaintiff,*

vs.                                      Case No. 20-cr-77-jdp

ANTHONY R. KROHN,

        *Defendant*.

---

## SENTENCING MEMORANDUM

Anthony Krohn is 37 years-old and has two decades of convictions and substance abuse under his belt. The "revolving door," as he calls it, of short prison sentences hasn't worked. He's rarely made it more than a year without finding his way back to jail. This time he's in federal court because he shot himself in the leg while intoxicated out in public. That said, it speaks to the man he can become that he hasn't alienated everyone in his life. And he's taking the right steps to repair that life. He stays in contact with his loved ones. He's taking a hard look at his substance abuse problem. And he's taking his mental health seriously.

It's a start but the mitigating factors here don't pull his sentence down below five years. But neither do the aggravating factors justify anything above 60 months' imprisonment. A five-year term is sufficient for sentencing's goals, and the Court should impose it.

1.     **In his 37 years, Krohn has been both victim and victimizer.**

      a.     **Krohn was born into abuse and his formative years weren't much better.**

Krohn was born on July 17, 1983, in Phoenix. He only lived with his birth parents and two siblings until he was three years-old because his father's physical abuse led Arizona's Department of Child Safety to place the three very young children into foster care. (*See* PSR, ¶¶ 61-62.) He bounced around foster homes for the next four years—he estimates as many as 14—before landing with Lori and Jeffery Krohn in 1990. (*See* PSR, ¶ 64.)

The next five years for Krohn were solid ones. While hardly wealthy, the family lived in a house in Glendale. He was formally adopted in 1992. (*See* PSR, ¶ 64.) Two years later, the family appeared to be on a roll. In 1994, Lori became pregnant, Krohn turned 11 years-old, and in late November his brother Kyle was born. (*See* PSR, ¶¶ 64-65.)

The good times were short lived and by 1995 the family was struggling. Perhaps from the added stress of a new baby in the home, Jeffery relapsed. (*See* PSR, ¶ 64.) His relapse came with frequent verbal abuse, and by the time Krohn was 13 years-old, Jeffery had become physically abusive to Krohn and Lori. Krohn couldn't escape. Aside from being just a kid, he was homeschooled until he was 17 years-old. (*See* PSR, ¶ 81.) There just wasn't a safe place for him.

2

Unsurprisingly, Krohn eventually did find a way to escape—drugs and alcohol. Between ages 13 and 18, he sporadically smoked marijuana and drank to get drunk. (*See* PSR, ¶¶ 75-76.) To her credit, Lori saw his mounting behavioral problems and consistently sought mental health treatment for him throughout his teenage years. (*See* PSR, ¶ 73.) But therapy and medication couldn't fix the turbulent home. Jeffery's misery was the family's misery, and it would go on for about another 10 years before the couple divorced. (*See* PSR, ¶ 64.)

By 2000, after five years of Jeffery's abuse and his intermittent sobriety, the couple decided a change of scenery might help him get control over his anger and illness. (*See* PSR, ¶ 64.) They had grown up in Wisconsin, so they decided to move the family to Janesville. It wasn't the panacea they'd hoped for. Jeffery's physical abuse continued. (*See* PSR, ¶¶ 64-66.) Krohn enrolled in high school but didn't graduate. Worse still, he joined the Latin Kings, which had disastrous results—more on that below. The gang must have seemed like the accepting family that this birth parents and adoptive parents couldn't provide.

> **b.** **Krohn's early adulthood showed only passing success.**

Matters were bad enough but by the summer of 2000, Krohn was physically an adult. He could hit back, and his first arrest and conviction were the result of a fight with Jeffery. (*See* PSR, ¶ 33.) This should have been an inflection point

3

because it made plain that one of them had to move out. But neither did. Krohn continued to live with Jeffery and Lori, despite his violence in the home. (*See* PSR, ¶¶ 34-36 & 67.) This mess persisted until his frequent drunk driving, not to mention cocaine abuse, while on probation came to a head. (PSR, ¶ 37.) The Rock County Circuit Court understandably had had enough and sentenced him to an 18-month prison term. (PSR, ¶ 37.)

This was Krohn's first time living away from home. And the stay with the Wisconsin DOC initially appeared to have done the trick. He was released to extended supervision on April 8, 2008. (*See* PSR, ¶ 37.) He managed to stay out of trouble for the year's remainder. But it was soon clear that he was circling the drain. First, he experimented with heroin a few times, which, mercifully, only made him feel sick. (PSR, ¶ 78.) Worse yet, he returned to cocaine in 2009. His low point came that summer; he must have been up to no good with the Latin Kings because he was arrested for an ugly battery in August. (*See* PSR, ¶ 42.)

A closer look at this conviction is necessary here. The episode is puzzling because Krohn's conviction for substantial battery and five-year probationary sentence are difficult to square with the criminal complaint's allegations. It states that he and three other gang members confronted a man with whom he had an existing dispute. According to the complaint, the man was beaten so badly that he

4

lost consciousness, and his injuries were so severe that his treating physicians surmised that the four had used a baseball bat.

These grim allegations are inconsistent with the circuit court's punishment because it's difficult to imagine that any judge would impose a sentence of probation for this case. After all, Krohn came to sentencing with a slew of prior convictions, not to mention a prior prison sentence. Worse still, the allegations involved a grisly, possibly gang-related, beating. It's especially difficult to imagine Rock County Circuit Court Judge James P. Daley—a former prosecutor who has never been called soft on crime—doing so. But Judge Daley did.

The takeaway for this Court should be that the crime's reality was much less severe, or that Krohn's involvement was much more peripheral, than the complaint's allegations suggest. To be sure, this Court can be certain that Krohn was involved in a felony battery. But the best explanation for the disproportionately mild sentence is that the crime's reality was also comparatively mild.

Whatever the reality, Krohn continued down the wrong path, picking up a felony cocaine charge while on bail for the battery case. (PSR, ¶ 43.) For the new charge, Judge Daley imposed a year at the Rock County Jail with work/school release, which explains the absence of arrests for the bulk of 2010. He had to return to jail each night or risk a transfer back to prison. To his credit, Krohn earned his

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

GED from Blackhawk Technical College in July. (*See* PSR, ¶ 81.) And his daughter was born that same year. (*See* PSR, ¶ 68.)

Unfortunately, Krohn returned to form and squandered his freedom. In October 2010, police officers found him out drunk, breaking car and apartment windows. (PSR, ¶ 44.) Given that he was on supervision in several cases, the March 2011 combined sentence wasn't a surprise—three years' incarceration. When he was released to extended supervision in February 2013, he wasn't yet 30 years-old, but he'd already been to prison twice. (*See* PSR, ¶¶ 43-44.)

### c.   Krohn's 30's saw his volatility turn inward toward self-destruction.

Krohn's last eight years have been an exercise in self-sabotage. After his release in February 2013, he picked up arrests in July and November—the latter for OWI (5th). The result was another two-year prison sentence. (PSR, ¶ 46.) While at the prison in Oshkosh he made an effort to take control of his substance abuse problem by participating in counseling. (PSR, ¶ 79.) He left Oshkosh for extended supervision in November 2015. (PSR, ¶ 43.) And within two weeks he had a job as a forklift operator. (PSR, ¶ 84.)

Krohn did well for about six months. But his success predictably led to overconfidence, and he thought he could return to drinking—just in moderation. He learned the hard way that his confidence was misplaced when he was arrested

6

for yet another OWI in May 2016. He stayed in jail on a probation hold until he was formally revoked and sent back to prison in August. (PSR, ¶ 47.)

Krohn spent the next three years in prison—repeating the depressing cycle. He used the time to learn welding, and about two weeks after his release in July 2019, his new skill got him a job at Stoughton Trailers. (PSR, ¶ 83.) But by October he was using methamphetamine and lost the job that same month. (PSR, ¶¶ 83 & 78.) In December, he entered inpatient treatment at a hospital in Oconomowoc for alcohol detoxification. He participated in outpatient treatment but his sobriety in the community was apparently short-lived. In January 2020, he was caught with drug paraphernalia. (PSR, ¶ 48.)

The wheels hadn't come off completely though. In February 2020, he got another welding job, which he was good at. (PSR, ¶ 82.) But the collapse was already on the horizon. At the end of May 2020, he stopped showing up for work. (PSR, ¶ 82.) Four days later Madison police found him on the ground, drunk, high, and bleeding from a gunshot wound. (PSR, ¶¶ 10-12.) Next to him was the firearm underlying the indictment, with which he had shot himself in the right leg.

7

### d. Krohn has made the most of his pretrial confinement.

Krohn has no illusions about the prison sentence coming his way.[1] But that realization hasn't led to despair and indolence. He'd be forgiven if it did. From his arrest on June 1 until August 19, he was locked up in two county jails, enduring two, 14-day quarantines.[2] From August to December, he was at the Dodge Correctional Institution where he had to do another 14-day quarantine before departing for Jackson Correctional Institution. He's been serving hard time—each quarantine meant 24/7 isolation, save for two weekly trips to the shower. Despite the pandemic's restrictions, he's worked hard to stay connected with his children and his family.[3] The DOC hasn't lifted the ban on visits, but he calls each of them at least weekly. To top it off, he's taken his physical therapy seriously. At the time of the presentence report interview, he had to use a cane to walk. (PSR, ¶ 71.) Today, he reports that he only uses it when he has to cover long distances.

It's obvious that Krohn has been a terrible steward of his substance abuse problem and mental health. And he knows it.[4] He doesn't mince words about his substance abuse problem. "I did not like my sober self or my sober life. I had no purpose." (Exh. B.) And he's equally forthright about his mental health, admitting

---

[1]    *See* Statement of Mr. Krohn, attached as Exhibit B.
[2]    His movements are detailed in Exhibit A.
[3]    *See* Letter of Support, attached as Exhibit C.
[4]    *See* Exh. B.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

"I also thought I could keep it under control and manage my mental illness on my own." (Exh. B.) It's encouraging, if not entirely satisfying, that he acknowledges his poor vigilance.

Better still though is that Krohn's time at Dodge Correctional resulted in a breakthrough that the Court shouldn't overlook. For the first time, he was diagnosed with borderline personality disorder. The psychiatrist also put him on mental health medication—and he takes it as prescribed. (PSR, ¶ 74.) Medication compliance will be critical to his success upon reentry.

A closer look here is again necessary. As little as five years ago, any criminal defense lawyer would have sought to deflect attention from a client's BPD diagnosis. The received wisdom was that psychiatrists reported little success in treating the disorder, and judges were justifiably concerned with volatile, self-destructive defendants with dim prospects for improvement. Portrayals in popular culture didn't help matters. Glenn Close's turn as Alexandra Forrest in Adrian Lyne's 1987 film *Fatal Attraction* didn't do BPD sufferers any favors. Indeed, the Federal Judicial Center's *Handbook for Working with Defendants and Offenders with Mental Disorders*, which dates from 2003, tells federal judges that "[p]rognosis for treatment is extremely poor." *See* 2003 WL 25569733 (3d. ed., 2003). To its credit, the handbook also notes that a BPD diagnosis "does not itself suggest violent, aggressive behavior toward others." *Id.* Rather, it means a person

9

may commit "violent, destructive acts towards oneself and impulsiveness and anger that may at times result in violent acts towards others." *Id.*

Psychology is not a mature science, which means that big changes aren't unusual. (Compare it with, say, chemistry; odds are good the periodic table will still be around in ten years.) Recent evidence shows that Dialectical Behavior Therapies are delivering much more successful outcomes.[5] "Once thought to be an untreatable condition, borderline personality disorder (BPD) is now effectively treated by a growing number of evidence based psychotherapeutic treatments."[6] Among these evidence based treatments, DBT has the strongest track record.[7]

Stripped of jargon, DBT approaches BPD as a set of problems that occur when "individuals born with high emotional sensitivity" come into contact with "invalidating environments," such as "families, schools, treatment settings, workplaces." DBT teaches folks with high emotional sensitivity how to navigate "people or systems…that cannot perceive, understand, and respond effectively to their vulnerabilities."[8]

---

[5]       *See* Lois W. Choi-Kain *et al.*, "Personality and Impulse Control Disorders: What Works in the Treatment of Borderline Personality Disorder," 4 CURRENT BEHAVIORAL NEUROSCIENCE REPORTER 21-30 (2017). A copy is attached for reference purposes as Exhibit D.
[6]       *Id.* at 21.
[7]       *Id.* at 23.
[8]       *Id.*

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

The Court doesn't have to evaluate these conclusions because a competent institution already has. The Bureau of Prisons recognizes the breakthrough. "DBT is an evidence-based practice for the treatment of Borderline Personality Disorder, with strong empirical support. In addition, the cognitive-behavioral interventions and modified therapeutic community model employed in the program are well supported in the professional literature."[9] The strong empirical support has led the BOP to offer an intensive DBT program for inmates with BDP called Steps Toward Awareness, Growth, and Emotional Strength (STAGES).[10] It runs between 12 and 18 months, with formal, half-day programming five days per week. The day's remaining half is for the inmate's work assignment or other programming.[11] Initially, the program was only available at USP Florence and FCI Terre Haute. In January 2020, the Justice Department announced that STAGES was among several programs the BOP would expand to comply with directives in the First Step Act.[12]

---

[9]     First Step Act Independent Review Committee, James M. Byrne, chair, "The Effectiveness of Prison Programming: A Review of the Research Literature Examining the Impact of Federal, State, and Local Inmate Programming on Post-Release Recidivism" (December 2019.) Given the treatment's, and program's, novelty, there was insufficient evidence for the committee to make conclusions about STAGES. A copy is attached for reference purposes as Exhibit E.

[10]     Federal Bureau of Prisons, *Directory of National Programs*, 22 (Sept. 13, 2017). A copy is attached as Exhibit F for reference purposes.

[11]     *Id*. at 22.

[12]     Office of Public Affairs, Department of Justice, "Department of Justice Announces Enhancements to the Risk Assessment System and Updates on First Step Act Implementation" (Jan. 15, 2020) *available at* https://www.justice.gov/opa/pr/department-justice-announces-enhancements-risk-assessment-system-and-updates-first-step-act.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

This digression's point is three-fold. First, Krohn's recent BPD diagnosis is novel, and treating it may reduce the volatility and self-destruction that have figured prominently in his criminal history. Second, through DBT, psychiatrists are getting much better treatment outcomes for the disorder than they were just a few years ago. Finally, the Bureau of Prisons, based on these two points, offers a DBT program for inmates like Krohn to reduce recidivism. The Court should recommend to the BOP his placement in the program.

> **2.    The Court should sentence Krohn to a concurrent five-year term because a shorter sentence doesn't achieve sentencing's goals.**

Krohn's sentencing guidelines range isn't that far off because his dangerous offense conduct calls for significant punishment and his criminal history counsels years of incapacitation. The mitigating factors are no doubt significant. But they don't pull the right sentence downward as much as they might because his firearm possession was far from anodyne and he's got a long history of crime. With different facts or a different criminal history, a four-year term might be appropriate because the mitigating factors are significant. But on this record, anything below five years is insufficient to meet sentencing's goals. Conversely, anything above five years is greater than necessary to achieve these aims.

Turning to the offense conduct, Krohn's crime could have produced more harm than it did. After all, he was out in public, at night, drunk and high. (*See* PSR,

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

¶¶ 10-12.) Though it was 2:00 in the morning, the number of passersby was higher than usual because of the ongoing protests over George Floyd's death in police custody. (*See* PSR, ¶ 11.) Any time a firearm goes off in a public place, innocent passersby and first responders are put at risk. Krohn's firearm possession in that emotionally-charged atmosphere fits squarely within the felon-in-possession statute's ambit. Society wants it punished.

Krohn's offense conduct also highlights the need for incapacitation because short prison sentences haven't kept him from committing crimes when he gets back in the community. His prior sentences of two or three years haven't been successful in preventing recidivism, which means there's little reason to expect a short prison sentence would succeed here. To be sure age, not to mention the prospect of decades in prison hanging over him should he commit another federal gun crime, will have some positive effect on public safety. Better still, he's very likely to succeed while under a rigid supervised release regime. The bottom line though is that he won't be locked up forever and he won't be on supervision forever.

On the ledger's other side, the mitigating factors are significant—but don't pull the sentence below five years. First and foremost, custody during the pandemic has been uniquely miserable for inmates like Krohn. Just because this fact is familiar, and there's little that can be done about it, doesn't make it

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

insignificant for sentencing purposes. Quite the opposite. Typically, jails and prisons reserve solitary confinement, or "seg," for punishing the most egregious instances of noncompliance—locked down in a cell for 23 hours per day with an hour out each day for exercise. That is hard time, but the 14-day quarantine protocol is harder still. Inmates would be locked down in their cells, either alone or with a cellmate, around the clock except for two weekly excursions out to shower. It's worth noting that the United Nations' Mandela Rules for the minimum standards for the treatment of prisoners places solitary confinement exceeding 15 consecutive days in the same category forms of torture.[13] This isn't to say that jails and prisons have responded inappropriately to the pandemic. It's just a reminder that keeping inmates and staff healthy has put inmates in an unusually miserable spot.

Krohn's had the additional burden of repairing the damage he did to himself. Many times per day his body reminds him why he's locked up. He still can't walk long distances without a cane. And, as he can explain to the Court at his sentencing hearing, the bullet remains in his right leg, having traveled down his thigh and settling in the upper part of his right calf. Since the presentence

---

[13]     United Nations, Econ. & Soc. Council, Comm. on Crime Prevention and Criminal Justice, United Nations Standard Minimum Rules for the Treatment of Prisoners (the Mandela Rules), U.N. Doc. E/CN.15/2015/L.6/Rev.1 (May 21, 2015), *available at* https://www.unodc.org/documents/justice-and-prison-reform/Nelson_Mandela_Rules-E-ebook.pdf (prohibiting solitary more than 15 days as punishment).

14

report interview, Krohn has learned that he might need surgery to remove the bullet because it's come to rest next to a nerve, risking chronic pain. His sentence should account for this burden. He'd surely do more prison time if he could get his leg back to 100% and didn't have to worry about further damage and pain from the bullet in his calf.

This factor isn't as mitigating as it might be though because Krohn has no one to blame for the injury but himself. He was fortunate that police officers were able to respond so quickly because he was bleeding from his right upper-thigh. (*See* PSR, ¶ 10.) His luck got better still when doctors at the St. Mary's emergency department were able to stop the bleeding quickly and get him stabilized. (*See* PSR, ¶¶ 10 & 12.)

Krohn is also fortunate that his recent BPD diagnosis generates optimism that otherwise there'd be no basis for because it too has mitigating force. The point here isn't a robust one, and it's useful to make plain what the defense is not arguing. First, it's not arguing that Krohn's traumatic upbringing and his BPD diagnosis as an adult somehow mitigate the sentence he's earned here. No doubt trauma isn't exclusively about long ago events that are over and done with. Rather, "trauma is not just an event that took place sometime in the past; it is also the imprint left by that experience on mind, brain, and body. This imprint has ongoing

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

consequences for how the human organism manages to survive in the present."[14] The imprint for Krohn has explanatory power, but it doesn't take him off the hook.

Second, the defense isn't arguing that Krohn's crime problem can be reduced to a mental health problem. It's not. If it were, a mental health care provider would have knocked it out by now. The problem is much more complex, and the proposed supervised release conditions reflect its complexity. Krohn isn't fundamentally different from the typical defendant. To stay out of trouble, he first has to stay sober and maintain steady employment. (*See* PSR, pp. 23 & 26.)

Instead, the point is that Krohn's recent BPD diagnosis opens a door that hasn't been there in the past. Now that a mental health professional has identified the problem—the disorder at the heart of his volatility and self-destructive behavior—for which he's never received treatment, he can benefit from programs designed to help people like him. And if DBT can teach him ways to avoid flying off the handle and blowing up his relationships, employment, and health, then he's much less likely to end up in that familiar situation: intoxicated out in public, doing something stupid and dangerous.

---

[14]     Bessel A. Van der Kolk, *The Body Keeps the Score: Brain, Mind, and Body in the Healing of Trauma*, 21 (2015).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Dated at Madison, Wisconsin, this 12th day of February, 2021.

Respectfully submitted,

*Peter R. Moyers*

Peter R. Moyers
Associate Federal Defender
Counsel for Mr. Krohn

FEDERAL DEFENDER SERVICES
 OF WISCONSIN, INC.
22 East Mifflin Street, Suite 1000
Madison, Wisconsin 53703
Tel: 608-260-9900
Fax: 608-260-9901
peter_moyers@fd.org

17

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.